UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., ANIMAL LEGAL DEFENSE FUND, ORCA NETWORK, and HOWARD GARRETT,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, and ELIZABETH GOLDENTYER, in her official capacity as Director of Animal Welfare Operations for the Eastern Region of the United States Department of Agriculture Animal and Plant Health Inspection Service,<br><br>Defendants. | Civ. No. 5:16-cv-268<br><br><br><br>**Complaint for Declaratory and Injunctive Relief** |

1.  Plaintiffs challenge the decision by Defendant U.S. Department of Agriculture ("USDA") to issue a new license to the Miami Seaquarium ("Seaquarium")—which exhibits the solitary and endangered orca Lolita in woefully inadequate conditions that cause her to suffer—as an additional site under the Animal Welfare Act ("AWA") license of Festival Fun Parks, LLC d/b/a Palace Entertainment ("Palace"). The USDA's AWA regulations unequivocally provide that "[l]icenses are issued to specific persons for specific premises and *do not transfer upon change of ownership, nor are they valid at a different location.*" 9 C.F.R. § 2.5(d) (emphasis added). On July 1, 2014, the Miami Exhibition Corporation d/b/a Miami Seaquarium ("MEC") was sold in a stock transaction in which 100% ownership of the company transferred from MEC's parent company, Wometco Enterprises, Inc. ("Wometco"), to buyer Palace. MEC then became a wholly-owned subsidiary of Palace and merged into Palace, at which time MEC ceased to exist as a corporate entity. At that time, 9 C.F.R. § 2.5(d) effectively rendered MEC's existing license

null and void. Then or about June 15, 2015, although the AWA and its standards provide that no license shall be issued to an exhibitor whose facility does not comply with the AWA standards, 7 U.S.C. § 2133; 9 C.F.R. §§ 2.1 and 2.11, the USDA added Seaquarium as an additional "site" under Palace's existing license notwithstanding Seaquarium's noncompliance with the AWA standards with respect to Lolita.[1] Plaintiffs challenge this decision to license Seaquarium as an additional site of Palace notwithstanding Seaquarium's noncompliance with the AWA standards as arbitrary and capricious, an abuse of discretion, and not in accordance with law, or otherwise in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).

## Jurisdiction and Venue

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because the acts and omissions giving rise to this lawsuit occurred in the USDA's Animal and Plant Health Inspection Service (APHIS) Animal Care office for the Eastern Region, which is located in Raleigh.

## Parties

4. Plaintiff People for the Ethical Treatment of Animals, Inc. ("PETA") is a Virginia non-stock corporation and animal protection charity pursuant to Section 501(c)(3) of the Internal Revenue Code, with its headquarters located in Norfolk, Virginia. PETA is dedicated to protecting animals from abuse, neglect, and cruelty, and undertakes these efforts through public education, cruelty investigations, research, animal rescue, legislation, special events, celebrity involvement, protest campaigns, and lawsuits to enforce laws enacted to protect animals. It brings this case on its own behalf to protect its organizational interests and resources.

---

[1] For nearly a year, the USDA allowed Palace to conduct regulated activities at Seaquarium without applying for and obtaining a new license for the facility.

5.  As part of its organizational activities, PETA has expended and continues to expend significant resources to combat the unlawful conditions in which Lolita is held at Seaquarium as a result of the USDA's failure to comply with the AWA—including by educating the public about these inhumane and unlawful conditions, pursuing complaints about Lolita's mistreatment, pursuing an administrative petition and litigation under the Endangered Species Act, and urging the USDA not to license Seaquarium because of its noncompliance with the standards that apply to Lolita's housing and care—all of which has caused and continues to cause PETA to divert resources that could have been spent on other projects to advance its mission. PETA could have avoided these expenditures if the USDA had complied with the AWA in licensing Seaquarium.

6.  PETA's injuries are likely to be redressed if the USDA's decision to license Seaquarium as an additional site under Palace's license is set aside because PETA will no longer have to expend resources educating the public about the unlawful and inhumane conditions in which Lolita is kept at Seaquarium, or urging the USDA to comply with the AWA by not licensing Seaquarium, among other ways, because Palace would not be able to obtain a license under the AWA for Seaquarium without improving Lolita's conditions by providing her with a larger living space, shelter from the sun, and a companion of her own species (or other biologically-related  and compatible animal), or, if unable to improve her conditions in compliance with the AWA, would be required to ensure that she is transferred to a different location where she can be held consistent with the applicable law.

7.  Those resources would then be directed to other PETA projects, including efforts to protect marine mammals and other animals used for public display and entertainment, in furtherance of its overall mission.

8. Plaintiff Animal Legal Defense Fund ("ALDF") is a non-profit corporation and charity pursuant to Section 501(c)(3) of the Internal Revenue Code, based in Cotati, California. For more than three decades, ALDF has fought to protect the lives and advance the interests of animals and expends substantial resources each year advocating on behalf of animals used for exhibition and entertainment. It brings this case on its own behalf to protect its organizational interests and resources.

9. As part of its organizational activities, ALDF has expended and continues to expend significant resources to combat the unlawful conditions in which Lolita is held at Seaquarium as a result of the USDA's failure to comply with the AWA—including by educating the public about these inhumane and unlawful conditions, pursuing complaints about Lolita's mistreatment, pursuing an administrative petition and litigation under the Endangered Species Act, and urging the USDA not to license Seaquarium because of its noncompliance with the standards that apply to Lolita's housing and care—all of which has caused and continues to cause ALDF to divert resources that could have been spent on other projects to advance its mission. ALDF could have avoided these expenditures if the USDA had complied with the AWA in licensing Seaquarium.

10. ALDF's injuries are likely to be redressed if the USDA's decision to license Seaquarium as an additional site under Palace's license is set aside because ALDF will no longer have to expend resources educating the public about the unlawful and inhumane conditions in which Lolita is kept at Seaquarium, or urging the USDA to comply with the AWA by not licensing Seaquarium, among other ways, because Palace would not be able to obtain a license under the AWA for Seaquarium without improving Lolita's conditions in compliance with the AWA or transferring her to a different location where she can be held lawfully.

4

11. Those resources would then be directed to other ALDF projects, including efforts to protect and conserve orcas and other animals, in furtherance of its overall mission.

12. Plaintiff Orca Network is a non-profit organization and charity based in Freeland, Washington, and is dedicated to raising awareness of the killer whales of the Pacific Northwest and the importance of providing them healthy and safe habitats.

13. Orca Network's activities include tracking and documenting the activities of the L pod of the Southern Resident Killer Whale ("SRKW") population—the pod from which Lolita was captured—and educating the public online and by presentations locally and worldwide about the natural history and status of the SRKWs.

14. As part of its organizational activities, Orca Network has expended and continues to expend significant resources to combat the unlawful conditions in which Lolita is held at Seaquarium as a result of the USDA's failure to comply with the AWA—including by educating the public about Lolita's capture, these inhumane and unlawful conditions, and a proposal for her to be returned to her natural habitat; pursuing complaints about Lolita's mistreatment; pursuing an administrative petition and litigation under the Endangered Species Act; and urging the USDA not to license Seaquarium because of its noncompliance with the standards that apply to Lolita's housing and care—all of which has caused and continues to cause Orca Network to divert resources that could have been spent on other projects to advance its mission. Orca Network could have avoided these expenditures if the USDA had complied with the AWA in licensing Seaquarium.

15. Orca Network's injuries are likely to be redressed if the USDA's decision to license Seaquarium as an additional site under Palace's license is set aside because Orca Network will no longer have to expend resources educating the public about the unlawful and inhumane

conditions in which Lolita is kept at Seaquarium, or urging the USDA to comply with the AWA by not licensing Seaquarium, among other ways, because Palace would not be able to obtain a license under the AWA for Seaquarium without improving Lolita's conditions in compliance with the AWA or transferring her to a different location where she can be held lawfully.

16. These resources could be directed to other Orca Network projects to protect and conserve orcas, and particularly Lolita's wild family, in furtherance of its overall mission.

17. Plaintiff Howard Garrett lives in Freeland, Washington, and is the director of Orca Network. For many years he has derived significant aesthetic pleasure from studying and observing the SRKWs.

18. Garrett has followed the plight of Lolita for decades. Since 1993, when he developed a personal bond with Lolita upon first seeing her in person, he has visited her at Seaquarium on several occasions. Each time, he has suffered great aesthetic harm and emotional distress from seeing her held in inhumane and unlawful conditions. Garrett is faced with the choice of having to visit Lolita at Seaquarium and be distressed from seeing her held in these conditions, or to refrain from visiting her to avoid such injuries and contributing monetarily to the very facility that is causing her suffering, both of which cause him additional emotional injury. Aware of Garrett's commitment to Lolita, members of the public who have visited Lolita also regularly contact him with reports, photographs, and video of her conditions.

19. For years, Garrett has submitted materials both to Seaquarium's owners and the federal government, including the USDA, in an effort to obtain more humane treatment for Lolita, and contributed to social media discussions regarding her conditions.

20. Garrett's aesthetic injuries are likely to be redressed if the USDA's decision to license Seaquarium as an additional site under Palace's license is set aside because Palace would not be

able to obtain a license under the AWA for Seaquarium without improving Lolita's conditions in compliance with the AWA or transferring her to a different location where she can be held lawfully. If Lolita were placed in humane conditions or sent to a coastal sanctuary in her native waters, Garrett would visit her often to study, photograph, and observe her, and do everything possible to assist in her transition.

21. Defendant USDA is an agency of the United States, with its headquarters in Washington, D.C., that is responsible for administering the AWA and therefore ensuring the humane care and treatment of animals that are used for exhibition, including the decision to add Seaquarium as an additional "site" to Palace's license. Defendant Elizabeth Goldentyer is the Director of Animal Welfare Operations for the Eastern Region of the USDA's Animal and Plant Health Inspection Service and has ultimate responsibility for licensing decisions for covered entities in the eastern portion of the United States, including Seaquarium.

## Legal Background

22. The AWA's congressional statement of purpose makes clear that the Act is intended to "insure" that animals used in exhibition "are provided humane care and treatment." 7 U.S.C. § 2131(1).

23. To accomplish this goal, Congress directed, in part, that the Secretary of Agriculture "shall issue licenses to dealers and exhibitors upon application therefor in such form and manner as he may prescribe," *id.* § 2133, and "is authorized to promulgate such rules, regulations, and orders as he may deem necessary in order to effectuate the purposes" of the Act, *id.* § 2151.

24. Accordingly, the AWA provides that no license "shall be issued until the dealer or exhibitor shall have demonstrated that his facilities comply with the standards promulgated by the Secretary" pursuant to the Act. 7 U.S.C. § 2133. Similarly, the USDA's implementing

regulations provide that "[a] license will not be issued to any applicant who," among other things, "[i]s not in compliance with any of the regulations or standards," 9 C.F.R. § 2.11(a)(2), and that "[t]he failure of any person to comply with any provision of the Act, or any of the provisions of the regulations or standards" promulgated pursuant to the Act "shall constitute grounds for denial of the license," *id.* § 2.1(e).

25. The USDA's implementing regulations further provide that licenses must be renewed each year. *See* 9 C.F.R. § 2.5(b). A renewal applicant must annually submit a one-page application that includes an "annual report," *id.* § 2.7, and a certification of compliance with the AWA standards, *id.* § 2.2(b), and pay a small fee, *id.* § 2.6. The licenses, on their face, expire one year from the date of issuance.

26. Additionally, "[l]icenses are issued to specific persons for specific premises and do not transfer upon change of ownership, nor are they valid at a different location." 9 C.F.R. § 2.5(d).

27. A licensee must also "promptly notify" the USDA "of any change in the name, address, management, or substantial control or ownership of his business or operation, or *of any additional sites*, within 10 days of any change." 9 C.F.R. § 2.8 (emphasis added).

28. Upon information and belief, no regulated activities may be conducted at the "new" or "additional" site of an existing licensee until the licensee has demonstrated compliance with the AWA at that site and the site has been specifically licensed to do so.

29. The Secretary of Agriculture was also directed to promulgate standards for the "humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors." 7 U.S.C. § 2143(a)(1).

30. With respect to marine mammals, the standards promulgated include minimum sizes for primary enclosures, 9 C.F.R. § 3.104, the requirement for natural or artificial shelter appropriate

for the species and climate "to afford them protection from the weather or from direct sunlight," *id.* § 3.103(b), and that marine mammals who are known to be "primarily social in the wild" are "housed in their primary enclosure with at least one compatible animal of the same or biologically related species," unless an attending veterinarian believes it is not in the animal's best interest, *id.* § 3.109.

### Facts Giving Rise to Plaintiffs' Claim

31. MEC held a Class C exhibitor license (no. 58-C-0147), initially issued on April 21, 1978, pursuant to 9 C.F.R. §§ 1.1 and 2.1.

32. Lolita was captured from her family on August 8, 1970, in Penn Cove off the coast of Washington State. She was approximately 3–6 years old at the time and was a member of the L pod of the SRKW population, which has since been listed as endangered.

33. Lolita was then purchased by Seaquarium, where she has been held since September 24, 1970.

*Lolita's Non-Compliant Tank*

34. The "primary enclosure" for a marine mammal "must be constructed and maintained so that the animals contained within are provided sufficient space, both horizontally and vertically, to be able to make normal postural and social adjustments with adequate freedom of movement in or out of the water." 9 C.F.R. § 3.104(a).

35. Under the primary enclosure standard, cetaceans must be provided a "pool of water" that has a "minimum horizontal distance (MHD)" that is "two times the average adult length" of the species. 9 C.F.R. § 3.104(b). The average length of an orca is 24 feet, meaning Lolita's tank must have a MHD of 48 feet. *Id.* § 3.104, Table III.

36. Lolita's "primary enclosure," as that term is defined by 9 C.F.R. § 1.1, is an oblong-shaped tank, with a large, crescent-shaped, solid concrete platform that extends from the bottom of the tank through the surface of the water and is used as a stage by Lolita's trainers during public performances. Gates can be closed on each side of the platform to separate the tank into two distinct, even smaller spaces.

37. Lolita's tank measures approximately 80 feet by 60 feet and the concrete platform measures approximately 5 feet wide in the middle of the tank, leaving unobstructed a space of only 80 feet by 35 feet. Therefore, the largest circular pool that could fit fully inside the tank without obstruction would measure only 35 feet across. The USDA's own internal documents acknowledge that the MHD for Lolita's tank is only 35 feet and that the MHD is 60 feet only if the concrete obstruction is completely "disregarded."[2] Lolita's tank at Seaquarium fails to meet this minimum requirement, even if the sole limited exception is applied. *See id.* § 3.104(b)(1)(i).

38. Allowing Seaquarium to keep Lolita in a tank that is smaller than the "minimum" standard set by the agency impairs Lolita's ability to engage in her natural behaviors and is inhumane.

*Lolita Lacks Adequate Shelter From Inclement Weather*

---

[2] While the USDA has since interpreted the MHD to "not preclude a partial obstruction such as the concrete structure in Lolita's pool," Letter from Elizabeth Goldentyer to Katherine Meyer (Mar. 28, 2012)—which defies the very definition of "minimum" and purpose of establishing a "minimum" tank size—it has more recently announced, consistent with the plain language of the regulation, that the calculation includes "only those areas of the pool that are unobstructed," Jonathan Kendall, *Lolita's Miami Seaquarium Tank Doesn't Meet Federal Standards, Activists Argue*, Miami New Times (Mar. 21, 2016) (quoting Lyndsay Cole, Assistant Director of Public Affairs, APHIS). Further, the agency's proposed rule to amend § 3.104 to provide that "APHIS will determine if partial obstructions in a horizontal dimension compromise the intent of the regulations and/or significantly restrict freedom of movement of the animal(s) in the enclosure" is an implicit acknowledgment that the agency does not currently have such discretion or authority, 81 Fed. Reg. 5629, 5650 (Feb. 3, 2016).

39. Lolita's tank also does not comply with the requirement of 9 C.F.R. § 3.103(b) that marine mammals kept outdoors be afforded protection from weather or direct sunlight. Lolita's tank is completely exposed to the sun and provides no opportunity for Lolita to shield herself during the most intense heat of the day, when the sun is highest, hottest, and no shadows are cast in the tank.

40. Lolita is therefore exposed to intense ultraviolet radiation as she floats around the surface of her tank. Although Lolita's tank is surrounded by stadium seating that is covered for the comfort of Seaquarium's customers, the stadium covering does not extend over the tank.

41. In addition to sunburn, exposure to ultraviolet radiation is a factor in the development of cataracts and retinal damage in marine mammals, and may also act as an immunosuppressant.

42. In the wild, orcas typically spend the majority of their lives submerged at depths that lessen the impacts of ultraviolet radiation. Because Lolita's tank is only 20 feet at its deepest point, Lolita is denied the opportunity to dive deeply to protect herself from the ultraviolet rays of the sun.

43. Moreover, because the water in the tank is relatively clear, even if Lolita were able to rest at the bottom of the small and shallow tank, the lack of turbidity from dissolved organic matter means that ultraviolet radiation has fewer impediments to reach her.

44. These conditions are harmful to Lolita's physical condition and are inhumane.

*Lolita's Isolation From Other Members of Her Species*

45. Although orcas are "primarily social in the wild," within the meaning of 9 C.F.R. § 3.109, Lolita has been completely isolated from any other member of her species since March 1980, when her tank-mate died after reportedly slamming his head into the side of their tank.

46. Although Lolita is often housed with Pacific white-sided dolphins, these animals are not of the same species as Lolita.

47. Orcas and Pacific white-sided dolphins do not normally interact in the wild.

48. Orcas and Pacific white-sided dolphins are no more biologically related than a human and a gorilla or chimpanzee.

49. Housing orcas and Pacific white-sided dolphins together is an inappropriate level of social interaction that cannot provide the interaction and stimulation necessary for either species' health and well-being. Orcas and Pacific white-sided dolphins are therefore not "biologically related" within the meaning and consistent with the purpose of this regulation.

50. Depriving Lolita of social companionship from members of her own or a biologically related species deprives her of the ability to engage in her natural behaviors, causes her much psychological suffering and distress, and is inhumane.

*USDA's Annual Rubber-Stamping of Seaquarium's License*

51. The USDA's records demonstrate that the conditions in which Seaquarium holds Lolita violate the "minimum standards" promulgated by the agency under the AWA—Lolita is kept in a tank so small that it fails to meet the minimum size requirements, without the ability to shield herself from the sun, and without the company of a compatible animal of the same or a biologically related species.

52. Despite the basic geometric and physical certainty, and other incontrovertible evidence demonstrating that the conditions in which Lolita is kept violate the minimum standards required by the AWA—including extensive evidence and expert opinion submitted by Plaintiffs in 2012 and 2014 that detailed these violations and the physical and psychological harm that Lolita

suffers as a result—the USDA renewed MEC's license annually until it was cancelled on July 7, 2015.

53. The AWA provides that "no such license shall be issued until the . . . exhibitor shall have demonstrated that his facilities comply" with the AWA standards. 7 U.S.C. § 2133. The USDA takes the position that this plain language applies only to the issuance of an *initial license* and not to its "administrative renewal" scheme. The USDA therefore does not require a demonstration of compliance with the AWA standards prior to *renewal* of an applicant's license, and in fact alleges that it is *required* to renew a license upon receipt of a one-page application and small fee and is powerless to deny a renewal. As a result, the agency annually renews licenses without any consideration of evidence before the agency that the applicant is in violation of the standards, which would render the applicant's certification of compliance with those standards false.

54. Under the USDA's interpretation of the statute, a party injured by the agency's licensure of an applicant that is in flagrant violation of the AWA standards can challenge the decision to issue an *initial license*, but cannot challenge the agency's affirmative decision to renew that license annually for decades.

55. Because licenses issued under the AWA "do not transfer upon change of ownership," 9 C.F.R. § 2.5(d), the existing license of a licensee that is sold and undergoes a change of ownership becomes null and void upon that sale.

56. For the same reason, a licensee who changes ownership is ineligible for the USDA's "administrative renewal" rubber-stamping process and must instead apply for and obtain a new *initial* license, which requires that the applicant demonstrate that its facilities comply with the AWA standards, 7 U.S.C. § 2133.

*Seaquarium's Change of Ownership*

57. In March 2014, Palace announced that it had signed an agreement for the acquisition of Seaquarium, which at that time was owned by MEC, a subsidiary of Wometco.

58. On May 14, 2014, Plaintiffs and others wrote to Defendant Goldentyer urging the agency not to issue or renew any AWA license related to the Seaquarium following the then-forthcoming sale of the facility in light of the fact that licenses "do not transfer upon change of ownership" pursuant to 9 C.F.R. § 2.5(d) and the facility could not meet the requirement for a new initial license since the conditions in which Lolita is held fail to meet the minimum standards of the AWA.

59. In a letter dated July 10, 2014, Michael Baroni, General Counsel for MEC, wrote to Defendant Goldentyer, as required by 9 C.F.R. § 2.8, to notify Defendant that "[o]n July 1, 2014, a stock transaction closed in which [Palace] acquired all ownership shares of stock in Miami Seaquarium. Palace therefore replaced Wometco and assumed 100% ownership of Miami Seaquarium, and as such, Miami Seaquarium underwent a change of control, and became a wholly-owned subsidiary of Palace. . . . On July 3, 2014, Miami Seaquarium merged into its new parent corporation, Palace, while continuing to do business under the name Miami Seaquarium."

*Palace's Additional Site*

60. Palace holds a Class C exhibitor license (no. 12-C-0052), initially issued on April 22, 2014, pursuant to 9 C.F.R. §§ 1.1 and 2.1.

61. The USDA's AWA regulations provide that "[l]icenses are issued to specific persons for specific premises." 9 C.F.R. § 2.5(d). Palace's license was issued for the specific premises known as Story Land in Glen, New Hampshire. During the prelicense inspection conducted on or around March 5, 2014, which is required prior to issuance of an initial AWA license, the inventory of animals on the site was limited to a single European rabbit.

14

62. On or around April 22, 2015, the USDA affirmatively renewed Palace's license via a rubber-stamping process for which the USDA, unlike when it issues an initial license, does not require compliance with the AWA standards.

63. Then, on or around June 11, 2015—nearly a year after MEC and its AWA license ceased to exist—the USDA conducted a "routine" inspection of the Seaquarium and, on the inspection report, for the first time labeled the premises "Site 002" under Palace's license.

64. Because licenses issued under the AWA "are [not] valid at a different location," 9 C.F.R. § 2.5(d), a licensee who wishes to add a new site to its existing license must satisfy the same requirements as those required for an *initial* license, which requires that the applicant demonstrate that its facilities comply with the AWA standards, 7 U.S.C. § 2133.

65. For this reason, the USDA has a longstanding policy that requires an inspection and demonstration of AWA compliance before any regulated activities are conducted at a licensee's new site.

66. Acting contrary to its longstanding policy and the AWA, USDA's records reveal that the agency did not require that Seaquarium demonstrate compliance with AWA standards prior to Palace conducting regulated activities at the site.

67. Instead, the USDA allowed Palace to operate without a valid license for nearly a year and then licensed it to conduct regulated activities at Seaquarium without ever demonstrating compliance with the AWA—notwithstanding that the Act prohibits licensure "until the dealer or exhibitor shall have demonstrated that his facilities comply" with the standards, 7 U.S.C. § 2133; that the addition of Seaquarium as a site following its sale to Palace did not fall within the USDA's rubber-stamping policy; and that the tank in which Lolita is held plainly fails to meet

the minimum size required, which is determined by a regulatory mathematical formula that affords the agency no discretion in its calculation, among other apparent violations.

## Claim for Relief

68. In licensing Seaquarium as a new site under Palace's license without requiring compliance with AWA standards, Defendants acted in violation of the plain language of the AWA regulations and in a manner that is arbitrary, capricious, an abuse of discretion, and not in accordance with the law, or otherwise in violation of the APA, 5 U.S.C. § 706(2).

69. Defendants' unlawful action injures Plaintiffs in the manner specified in the paragraphs above.

## Request for Relief

WHEREFORE, Plaintiffs respectfully requests that this Court:

(1) Declare that Defendants acted arbitrarily and capriciously and not in accordance with law, abused their discretion, and exceeded their statutory jurisdiction and authority, or otherwise in violation of the APA, in licensing Seaquarium as a new site under Palace's license notwithstanding the facility's noncompliance with AWA regulations;

(2) Set aside as unlawful Defendants' decision to license Seaquarium as a new site under Palace's license;

(3) Award Plaintiffs their attorneys' fees and other litigation costs reasonably incurred in this action, to the extent permitted by law; and

(4) Grant Plaintiffs such other and further relief as the Court may deem just and proper.

Date: May 18, 2016

Respectfully submitted,

/s/ Dan Bryson

Daniel K. Bryson
NC Bar # 15781
Jeremy R. Williams
NC Bar # 48162
Whitfield Bryson & Mason LLP
900 W. Morgan St.
Raleigh, NC 27603
Tel: 919-600-5000
Fax: 919-600-5035
dan@wbmllp.com
jeremy@wbmllp.com
*Local Civil Rule 83.1 Counsel for Plaintiffs*

Jared Goodman*
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
323-210-2266
JaredG@petaf.org
*Counsel for People for the Ethical Treatment of Animals, Inc.*

Matthew Strugar *
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
323-210-2263
MatthewS@petaf.org
*Counsel for People for the Ethical Treatment of Animals, Inc.*

Matthew Liebman *
Animal Legal Defense Fund
170 East Cotati Ave.
Cotati, CA 94931
707-795-7533
MLiebman@aldf.org
*Counsel for Animal Legal Defense Fund*

\* Appearance to be made by Special Appearance